**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

|                                              |     |                           |
| -------------------------------------------- | --- | ------------------------- |
| SMITH & NEPHEW, INC.,                        | )   |                           |
|                                              | )   |                           |
|     Plaintiff,           | )   |                           |
|                                              | )   |                           |
| v.                                           | )   | No. 2:12-cv-02476-JPM-dkv |
|                                              | )   |                           |
| NORTHWEST ORTHO PLUS, INC.; TOM              | )   |                           |
| CORBETT; BARRETT DOWNS; BRIAN                | )   |                           |
| KYM; JIM WORKLAND; MICHAEL JAY               | )   |                           |
| BARR; A1A, INC.; and AVENUE                  | )   |                           |
| MEDICAL PRODUCTS, LLC,                       | )   |                           |
|                                              | )   |                           |
|     Defendants.          | )   |                           |

---

**ORDER GRANTING PLAINTIFF'S APPLICATION FOR PRELIMINARY
INJUNCTION**

---

Before the Court is Plaintiff's Application for Preliminary Injunction. (ECF No. 102.) On August 20, 2012, the parties filed pre-hearing briefs on this matter. (ECF No. 102; ECF No. 103; ECF No. 105.) On August 21-22, 2012, the parties presented testimony and evidence in a hearing held before the Court. (ECF No. 109; ECF No. 110.) On September 21, 2012, Plaintiff filed a post-hearing brief on this matter. (ECF No. 145.) On September 28, 2012, Defendants filed post-hearing briefs on this matter.[1] (ECF No. 150; ECF No. 152.)

For the reasons stated below, Plaintiff's Application for Preliminary Injunction, (ECF No. 102), is GRANTED.

---

[1] Defendant Michael Jay Barr has separate representation and, therefore, submitted separate briefs. (See ECF No. 152.)

The Court, therefore, ENJOINS Thomas Andrew Corbett, Emory Barrett Downs, James Joseph Workland, Jr., Brian Craig Kym, and Michael Jay Barr from directly or indirectly calling upon, soliciting, or initiating efforts to divert from Smith & Nephew the customers listed in the Complaint for Injunctive Relief. (See ECF No. 1-2 ¶¶ 34, 37.)  This injunction shall remain in effect until the conclusion of arbitration between the parties as required by the terms of the Sales Representative Agreement, (Hr'g Ex. 1 ¶ 18), and the Sales/Service Representative Agreements.  (Hr'g Ex. 12 ¶ 18; Hr'g Ex. 13 ¶ 18; Hr'g Ex. 14 ¶ 18.)

## I.  BACKGROUND

Plaintiff Smith & Nephew, Inc., ("Plaintiff" or "Smith & Nephew") manufactures and distributes medical devices.  (Sales Representative Agreement, Hr'g Ex. 1.)  In early May, 2010, Defendants Thomas Andrew Corbett ("Corbett") and Emory Barrett Downs ("Downs"), acting as guarantors of the entity Northwest Ortho Plus, Inc., signed a Sales Representative Agreement with Smith & Nephew.  (Id.)

The contract specified that Corbett and Downs would act as sales representatives until December 31, 2015, subject to extension.  (Id. ¶ 6(a).)  Smith & Nephew, however, had the right to terminate the contract under certain circumstances. (See, e.g., id. ¶ 6(d).)  If Smith & Nephew terminated the

contract for cause, it could enforce the one-year noncompete clause in the contract. (<u>Id.</u> ¶ 16(a).) If Smith & Nephew terminated the contract without cause, it could enforce the noncompete clause only to the extent that it made monthly payments to Corbett and Downs of seventy-five percent of the average compensation they earned during the last year of their employment. (<u>Id.</u> ¶ 16(b).)

In late May, 2010, Defendants James Joseph Workland, Jr., ("Workland"), Brian Craig Kym ("Kym"), and Michael Jay Barr ("Barr") signed Sales/Service Representative Agreements that contained a noncompete clause. (Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.) They signed those contracts because Corbett told them that Smith & Nephew would terminate anyone that did not sign a noncompete agreement. (See Hr'g Ex. 4; Tr. 235-12.) Corbett and Downs also received a $150,000 payment, which was contingent upon Workland, Kym, and Barr signing the Sales/Service Representative Agreements. (Tr. 22:13-15.)

The noncompete clauses in both the Sales Representative Agreement and the Sales/Service Representative Agreements do not allow Corbett, Downs, Workland, Kym, or Barr to: "[c]all upon, solicit, or initiate efforts to divert in any way customers served by [the signatory] on behalf of [Smith & Nephew] in the Restricted area (as defined herein)." (Hr'g Ex. 1 ¶ 16; Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.) This

restriction lasts for one year from the end of the signatory's employment.  (Hr'g Ex. 1 ¶ 16; Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.)

In mid-April, 2012, Workland, Kym, and Barr signed contracts to be sales representatives for A1A, Inc. ("A1A"). (Hr'g Ex. 35; Hr'g Ex. 43; Hr'g Ex. 48.)  A1A is a corporation solely owned by David Tully Eva ("Eva"), (Eva Dep., ECF No. 136-10, at 25), and distributes products of DePuy Orthopaedics, Inc., ("DePuy") that compete with Smith & Nephew products.  (Tr. 252:3-20.)  After signing their agreements with A1A, Workland and Kym received letters drafted by Smith & Nephew that purportedly waived their noncompete agreements with Smith & Nephew.  (Tr. 109:16-110:20, 114:15-115:6.)

Also in mid-April, 2012, Corbett and Downs signed contracts with Avenue Medical Products, LLC, ("Avenue Medical") and MD Systems, LLC, ("MD Systems").  (Hr'g Exs. 16-17, 30, 32.) Avenue Medical and MD Systems are corporations under the control of Eva.  (Test. of Eva, Tr. 364:10-11; Eva Dep., ECF No. 136-10, at 25.)  While Avenue Medical does sell products that do not compete with Smith & Nephew products, (see Tr. 364:24-365:12, 375:6-15), the contract with MD Systems specifies that MD Systems is under contract with Smith & Nephew's competitor DePuy.  (Hr'g Ex. 17 ¶ 3(B); Hr'g Ex. 32 ¶ 3(B); see also Test. of Corbett, Tr. 63:16-22.)

After signing their contracts with Avenue Medical and MD Systems, Corbett and Downs notified Smith & Nephew that they intended to resign from Smith & Nephew. (See Hr'g Ex. 18; Hr'g Ex. 19.) In response, on May 17, 2012, Smith & Nephew notified Corbett and Downs that they would be terminated for cause. (Letter from Smith & Nephew's Counsel, Hr'g Ex. 54.)

On June 19, 2012, Smith & Nephew filed a Complaint for Injunctive Relief in the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis. (ECF No. 1-2.) On that same date, the case was removed to federal court. (ECF No. 1.) The Complaint alleges that Corbett, Downs, Workland, Kym, and Barr by working for A1A, Avenue Medical, and MD Systems violate their noncompete agreements with Smith & Nephew. (ECF No. 1-2 ¶ 30.) On August 20, 2012, Smith & Nephew filed an Application for Preliminary Injunction. (ECF No. 102.)

**II. TESTIMONY AND EVIDENCE INTRODUCED BY THE PARTIES**

The Court held a hearing on the Plaintiff's Application for Preliminary Injunction from August 21, 2012, to August 22, 2012. (See ECF No. 109; ECF No. 110.) At the hearing, Plaintiff called the following witnesses: Thomas Andrew Corbett; Emory Barrett Downs; James Joseph Workland, Jr.; Brian Craig Kym; Michael Jay Barr; and Allen Lewis Kepler. (ECF No. 143; ECF No. 144; see also ECF No. 111.) All of these witnesses were cross-examined by Defense counsel. Defendants then called David

Tully Eva, who was cross-examined by Plaintiff's counsel. (ECF No. 144; see also ECF No. 111.)

The Court allowed post-hearing deposition designations and submission of additional exhibits. (Tr. 349-61, 404-05.) On August 24, 2012, Defendants Northwest Ortho Plus, Inc., Corbett, Downs, Kym, and Workland designated parts of the deposition testimony of Corbett, Downs, Workland, Kym, Barr, Eva, Allen Lewis Kepler ("Kepler"), Benjamin Kremer ("Kremer"), John Froman, David Ware, Teresa Steen ("Steen"), John Neighbors, and Jerry Goodman. (ECF No. 113.) On that same day, Defendant Barr designated parts of the deposition testimony of Barr, Kepler, Steen, and Jerry Goodman. (ECF No. 115.) On that same day, Plaintiff filed two additional exhibits: an email from Kym to Doug Wray and Downs, (ECF No. 114-1); and a list of the voicemails received by Corbett from March to June of 2012. (ECF No. 114-2.) On August 27, 2012, Defendants Northwest Ortho Plus, Inc., Corbett, Downs, Kym, and Workland filed the designated depositions and various attachments to those depositions. (ECF Nos. 117-34.)

On August 28, 2012, Plaintiff filed counter-designations and the depositions of Corbett, Downs, Workland, Kym, John Froman, Kremer, Barr, David Ware, Steen, Eva, and Kepler. (ECF No. 136.) In that same document, Plaintiff filed objections to Defendants' designations of the deposition testimony of Corbett,

Workland, Barr, John Froman, Kremer, Eva, Kepler, and John Neighbors. (Id.)

On August 30, 2012, Defendants Northwest Ortho Plus, Inc., Corbett, Downs, Kym, and Workland filed objections to Plaintiff's counter-designations of the depositions of Corbett, Downs, and Eva. (ECF No. 141.) In that same document, those Defendants also responded to Plaintiff's objections regarding Corbett, Workland, Kremer, Eva, Kepler, and John Neighbors. (Id.) On that same day, Defendant Barr filed objections to the Plaintiff's counter-designation of Barr's deposition and responded to Plaintiff's objections regarding Barr. (ECF No. 142.)

On September 28, 2012, Defendants Northwest Ortho Plus, Inc., Corbett, Downs, Kym, and Workland filed a post-hearing brief and attached the declaration testimony of Corbett, Downs, Kym, Dr. Adam Olscamp ("Dr. Olscamp"), and Dr. Gregory D. Dietrich ("Dr. Dietrich"). (ECF No. 150.) With leave of the Court, (ECF No. 157), those Defendants then filed the declaration of Dr. Douglas McInnis ("Dr. McInnis") on October 2, 2012. (ECF No. 158.)

Having reviewed all of the evidence submitted by the parties regarding the pending Motion, the Court provides the following summary of the relevant testimony and evidence that

the parties introduced at the hearing.  (See ECF No. 143; ECF

No. 44.)

**A. TESTIMONY OF THOMAS ANDREW CORBETT**

Corbett's testimony at the hearing addressed the following

three topics:  (1) Smith & Nephew's employment of Workland, Kym,

and Barr; (2) how Corbett and Downs were compensated by MD

Systems; and (3) actions by Corbett that may violate the

noncompete clause in the Sales Representative Agreement.

Corbett's testimony was repeatedly contradicted by evidence

introduced at the hearing.

**1.    Smith & Nephew's Employment of Workland, Kym, and Barr**

This portion of Corbett's testimony addressed three points:

(a) the noncompete agreements between Smith & Nephew and

Workland, Kym, and Barr; (b) the scope of the employment

relationship between Smith & Nephew and Workland, Kym, and Barr;

and (c) the waiver letters received by Workland and Kym.

**a.    The Noncompete Agreements Signed by Workland, Kym, and Barr**

Corbett testified regarding whether noncompete agreements

are standard in the industry, and whether Workland, Kym, and

Barr received consideration for signing the Sales/Service

Representative Agreements.

Specifically, upon being asked if it is standard in the

medical-device industry to have noncompete agreements with sales

8

representatives, Corbett testified that: "I don't know if I can say it is industry standards [sic] because I worked with a number of other noncompetitive companies that we did not sign agreements with." (Tr. 18:5-10.)

Smith & Nephew impeached that testimony. Smith & Nephew produced an affidavit filed by Corbett on April 27, 2011, in a case before the United States District Court for the District of Montana. (Hr'g Ex. 3; Tr. 19:7-23.) In that affidavit, Corbett states: "Restrictive covenants are a normal business practice in the orthopedic device industry." (Hr'g Ex. 3 ¶ 7.) When confronted with this statement, Corbett replied: "I don't know if I would say normal business practice, but, you know, it's common." (Tr. 20:21-21:8.)

Second, as to whether he paid Workland, Kym, and Barr for signing the Sales/Service Representative Agreements that contained the noncompete clauses, Corbett testified that: "I don't remember. That was in 2010. I probably — I don't know if I gave them any compensation, but I know at different time periods [sic] like Monty and the people in Montana would give them bonuses for performance." (Tr. 57:5-8.)

Corbett, however, admitted that he was paid $150,000 contingent on Workland, Kym, and Barr signing the noncompete agreements with Smith & Nephew. (Tr. 21:19-22:15.) Corbett further admitted that he requested and used the $150,000 to pay

some of the representatives that worked in the same capacity as Workland, Kym, and Barr: "You know what, I don't remember at that time what I did with [Workland, Kym, and Barr] as far as that goes, but I know we used that money pretty much immediately to take care of some of [the] other reps." (Tr. 50:20-23.)

Corbett also testified that he had "no idea" as to the location of any records that would indicate if he had paid Workland, Kym, and Barr to sign the Sales/Service Representative Agreements. (Tr. 57:9-12.) Corbett, however, admitted that such records may exist. While Corbett testified that he had destroyed his records when he closed his Smith & Nephew office, he admitted that his accountant would still have his financial records for the relevant time period. (Tr. 57:13-58:10.)

S & N[2]: Did you destroy any financial records [for the relevant time period]?

Corbett: Not that I know of.

S & N: Where would those be?

Corbett: My financial records? Probably on file somewhere with our accountant.

S & N: Is that where it might show if these individuals were paid?

Corbett: I don't think it would show specifically individuals getting paid.

(Tr. 58:1-6.)

---

[2] In the interest of conserving space, when Smith & Nephew's counsel is the questioner, he will be identified as "S & N."

**b.   The Scope of Smith & Nephew's Employment of Workland, Kym, and Barr**

Corbett testified regarding whether Workland, Kym, and Barr had assigned territories, and whether Workland, Kym, and Barr had sales responsibilities.  Corbett's testimony was impeached regarding both of these aspects of the employment relationship between Smith & Nephew and Workland, Kym, and Barr.

First, upon being asked if Workland and Barr had assigned territories, Corbett testified that they did not.

> S & N:   Did [your] sales representatives or independent contractors have assigned territories?
>
> Corbett:  No, they didn't.  It was just Barrett Downs and myself.

(Tr. 18:24-19:1; <u>see also</u> Tr. 24:4-10.)

Smith & Nephew impeached that testimony.  Smith & Nephew produced an email from Corbett to Kremer, a district manager for Smith & Nephew.  (Tr. 24:25-26:11; <u>see also</u> Test. of Kepler, Tr. 347:9-16.)  In the email, Kremer asks Corbett and Downs to list the representatives covering each account "to provide [sic] most accountability to reps and any accounts that do a [sic] real business."  (Hr'g Ex. 5 at 2.)  Corbett's reply to that email states:  "I went through and updated [the list]."  (<u>Id.</u>)  In an attachment to this email exchange, Workland and Barr are listed as servicing particular accounts.  (Hr'g Ex. 5 at 4-5; Tr. 27:4-19.)

Smith & Nephew also produced an email that Corbett sent to Eva on February 10, 2012. (Hr'g Ex. 10.) In an attachment to that email, Corbett states: "We have some very good Representatives that would need to be part of a transition." (Hr'g Ex. 10 at 2.) Under that statement, Corbett lists specific territories next to the names of Workland, Kym, and Barr.[3] (Id.)

Second, upon being asked if Workland, Kym, and Barr were expected to make sales for Smith & Nephew, Corbett testified that "[t]here wasn't an expectation" that they would make sales and that all customers "would be listed as [Barrett and my] customers, we're the ones who called on them and tried to sell to [sic] them Smith & Nephew products."[4] (Tr. 24:11-24.)

Smith & Nephew impeached that testimony by producing emails in which Corbett discusses sales strategies with Workland, Kym, and Barr for the year 2012. (Tr. 29:20-36:13.) On January 3,

---

[3] In its post-hearing brief, Plaintiff points out that both Corbett and Eva repeatedly denied that Corbett ever provided Eva with a list of representatives and the representatives' territories. (Pl.'s Post-Hr'g Mem., ECF No. 145, at 5; see Corbett Dep., ECF No. 136-1, 80:20-23; Eva Dep., ECF No. 136-10, 68:7-17, 84:15-17.)

[4] Barr's testimony contradicts Corbett's testimony. Barr testified that he became a salesperson while at Smith & Nephew: he had direct sales responsibilities and called on physicians. (Tr. 229:11-230:2.)

The testimony of Kepler, Smith & Nephew's Regional Vice President for the West Region, (Tr. 249:11-12), also contradicts Corbett's testimony. Kepler testified that he expected his entire sales force, which included Workland, Kym, and Barr, to make sales. (Tr. 298:23-299:5.) To bolster this testimony, Smith & Nephew pointed out that the contracts of Workland, Kym, and Barr are entitled "Sales/Service Representative Agreement" and state: "Service Rep is independently in the business of soliciting sales . . . ." (Tr. 344:17-345:5; Hr'g Ex. 12; Hr'g Ex. 13; Hr'g Ex. 14.)

2012, Corbett sent an email to his team stating that they had underperformed in the prior year: "Gut check – We just had our worst finish yet." (Hr'g Ex. 6.) In that email, Corbett acknowledges that Workland grew his business significantly: "Some of you had a great year and grew your business significantly (Scott Wiggins, Jamie Warwick, Jim Workland) – Thank you!" (Id.) Corbett also tells his team that "if each of us grew our business [sic] $250,000, we would smoke our number." (Id.)

Smith & Nephew also produced responses to Corbett's email by Barr and Kym that impeached Corbett's testimony. On January 4, 2012, Barr responded to Corbett's email by saying "my customers" had fewer cases and that: "My focus is strong and [sic] continue to sell with great ambition." (Hr'g Ex. 7.) On January 10, 2012, Kym responded to Corbett's email with a list of ways for him to grow Smith & Nephew's business in 2012. (Hr'g Ex. 8.) In that response, Kym's signature line identifies him as a "Full Line Sales Associate." (Id. at 2.)

Smith & Nephew also produced two more emails by Corbett that impeached Corbett's testimony. On January 11, 2012, Corbett responded to Kym's January 10, 2012, email by saying that: "Instead of making the gut check [sic] comment, I probably should have just kicked everybody in the ass to go out and try and sell something." (Id.) On January 16, 2012,

Corbett sent an email to his team that further addressed his goals for 2012:  "My goal for this group in 2012 is to gain tremendous sales growth and not necessarily in $, but rather as sales people [sic]."  (Hr'g Ex. 9.)

### c.   The Waiver Letters Received by Workland and Kym

Regarding the waiver letters received by Workland and Kym, Corbett testified regarding an email sent to Kremer, Corbett, and Downs by Steen, who worked in Smith & Nephew's human resources department.  (Hr'g Ex. 28; Tr. 109:16-110:12.) Attached to that email are letters that would waive the noncompete agreements of Workland and Kym.  (Hr'g Ex. 28; Tr. 110:13-20.)

Regarding that email, Corbett testified on cross-examination that he called Kremer and Steen, but was never told that the waivers were sent in error.  (Tr. 110:24-111:14.)

On redirect, Smith & Nephew pointed out that the email directed Kremer to sign and send the letters to Workland and Kym via FedEx.  (Tr. 114:15-16.)  Smith & Nephew was referring to the portion of the letter that states:  "Ben, please sign each letter in the space provided and send via FedEx with a copy of the Service/Sales Rep [sic] agreement for reference.  I will need signed copies of the letter returned to my attention via scan/fax at your convenience."  (Hr'g Ex. 28.)

Corbett admitted on redirect that he did not wait for Kremer to sign the letters.

> S & N: Again, you didn't wait for Mr. Kremer to actually sign these before you provided them to Mr. Workland and Mr. Kym?

> Corbett: No, I didn't. I saw the Smith & Nephew stamp on there, I assumed that was official.

(Tr. 115:3-6.)

Corbett further testified on redirect that, when he received the email, he had already signed an agreement with MD Systems to receive a five-percent commission on new sales of DePuy products. (Tr. 113:9-13.) Corbett then admitted that it was, therefore, in his personal financial interest for Workland and Kym to receive the waiver letters.

> S & N: It was official, and it was in your interest that Mr. Workland and Mr. Kym be selling DePuy products, wasn't it?

> Corbett: If it's in my interest, you know, at this point in time I was leaving, they were leaving, you know, if that works out for them, yes, that works out for them, but I guess you could say it would be in my interest.

(Tr. 115:7-12.)

### 2. How Corbett and Downs Are Compensated Under Their Agreement with MD Systems

On direct examination, Smith & Nephew asked Corbett how he and Downs are being compensated under their contracts with MD Systems. (Tr. 60:14-64:15.) Corbett testified that he and

15

Downs received an initial payment of $250,000 as well as a five-percent commission on all new sales made by A1A, a company controlled by Eva that sells DePuy products.  (Id.)  Regarding the five-percent commission, Corbett testified that it applies to all recorded new sales, regardless of whether Corbett and Downs personally make the sale.  (Tr. 62:20-22.)  Furthermore, Corbett testified that the five-percent commission began accruing as of April 1, 2012, (Tr. 62:20-64:14), which was before he had formally resigned from Smith & Nephew.  (See Hr'g Ex. 18.)

### 3.  Actions by Corbett That Potentially Violate the Noncompete Clause in the Sales Representative Agreement

Corbett's testimony addressed two possible violations of the noncompete clause:  (a) that Corbett continued to contact customers he served for Smith & Nephew, and (b) that Corbett put a former customer in contact with DePuy representatives.

### a.  Continued Contact with Former Customers

Smith & Nephew presented evidence of two instances in which Corbett contacted former customers.  First, Smith & Nephew produced a document showing that Corbett had attended a training lab in Renton, Washington, with his former customer Dr. McInnis and Workland, whom Corbett knew to be working for A1A at that time.  (Tr. 72:22-76:23; Hr'g Ex. 20.)  That meeting took place on April 26, 2012, the day after Corbett submitted his

resignation letter to Smith & Nephew. (Tr. 74:17-20; see also Hr'g Ex. 18.) Despite being confronted with the fact that he was receiving a commission on the sale of DePuy products at that time, and the fact that Workland was at this meeting representing A1A, Corbett maintained that he was not involved in any way with selling DePuy products on that trip: "You know, I wouldn't have been [involved in the sale of DePuy products], because I just turned in my resignation, and I wouldn't have known enough about DePuy products to be able to sell DePuy products . . . ." (Tr. 77:9-19.)

Second, Corbett testified that he drove three hours with his former customer Dr. Olscamp so that they could go fishing in Ellensburg, Washington. (Tr. 77:23-81:19.) Corbett further testified that Downs was also there with Downs's former customer Dr. Dietrich. (Tr. 82:3-5.) Corbett maintained that he brought only brochures illustrating products that do not compete with Smith & Nephew products and that the primary purpose of the trip was to go fishing.

> S & N: Mr. Corbett, what literature did you bring with you to this event from Spokane?
>
> Corbett: I brought brochures on the Invuity retractors and also on their Saber suction devices [sic] that has the light attached to it. I knew that both Dr. Olscamp and Dr. Dietrich would be interested in this. Dr. Dietrich happens to be a spine surgeon, doing certain spinal procedures, [sic] that

> would actually be a very appropriate instrument to have.

S & N: So did you go down there to go fishing or did you go down there to demonstrate Avenue Medical Products?

Corbett: I actually went to go fishing.

(Tr. 80:25-81:10.)

Corbett's credibility regarding his trip with Dr. Olscamp was undermined by an email A1A sent to Corbett. (Tr. 78:17-79:4.) That email was not only sent to Corbett and Downs, but also to numerous A1A employees. (Hr'g Ex. 21.) The email contained an itinerary for the trip and had a subject line reading: "5/10-11 Surgeon Training." (Hr'g Ex. 21.) Despite those indications in the email that the event was intended to allow A1A employees to promote DePuy products, Corbett maintained that he and Downs did not know that DePuy products were going to be shown at that event.

S & N: Did you know that Dr. Olscamp was going to be looking at DePuy products at this event?

Corbett: I found out that Pat Williams was going to be there. I didn't know what he was bringing with him, which he did bring DePuy products with him, and when Barrett [Downs] and I saw that, we said we could not be involved with anything that had to do with DePuy, we could [sic] there to show the Invuity, but if there was anything discussed about DePuy, we had to leave.

(Tr. 81:22-82:2.)

18

**b. Putting a Former Customer in Contact with DePuy Representatives**

Smith & Nephew produced two emails indicating that Corbett directed Workland to contact a customer that Corbett had served for Smith & Nephew. First, Smith & Nephew produced an email exchange between Wendy Tihista ("Tihista"), a Vice President of Strategic Development for DePuy, and Lisa Sjoblom ("Sjoblom"), the purchasing assistant at a hospital that Corbett had served for Smith & Nephew. (Tr. 86:25-87:20; Hr'g Ex. 23.) In that email exchange, Sjoblom says that she will choose another vendor if the pricing is not agreed upon before the next surgery performed by Dr. Olscamp, a customer that Corbett served for Smith & Nephew: "Dr [sic] Olscamp has totals scheduled for Monday [sic] June 18th. . . . If there is no pricing agreed upon by this time, we will be using another vendor for our cases." (Hr'g Ex. 23.) Sjoblom forwarded her exchange with Tihista to Corbett. (Id.)

Second, Smith & Nephew produced an email chain showing that Tihista had forwarded to Corbett her message to Sjoblom. (Hr'g Ex. 24; 89:17-90:1.) Corbett then forwarded Tihista's message to Workland. (Hr'g Ex. 24.) Despite testifying that he could not be involved in that pricing discussion, (Tr. 88:7-89:16), Corbett testified that he forwarded Ms. Tihista's email to

Workland because he "assumed [Workland] could be a point person on this one." (Hr'g Ex. 24; Tr. 90:23-24.)

**B. TESTIMONY OF EMORY BARRETT DOWNS**

Downs's testimony addressed the following two topics: (1) how Downs is being paid by MD Systems; and (2) actions by Downs that potentially violate the noncompete clause in the Sales Representative Agreement.

### 1. How Downs Is Paid by MD Systems

Regarding his contract with MD Systems, Downs testified that he received an initial payment of $250,000, half of which was paid by A1A. (Tr. 134:14-136:8; see also Hr'g Ex. 33.) Downs further testified that he receives a commission on the sale of DePuy products to new A1A customers, a group that includes the customers that Downs served for Smith & Nephew. (Tr. 136:10-19; see also Hr'g Ex. 32 ¶ 2B.)

In addition, Downs did not contest that he began receiving commissions on the sale of DePuy products before he left Smith & Nephew. (Tr. 134:25-135:16.)

### 2. Actions by Downs That Potentially Violate the Noncompete Clause in the Sales Representative Agreement

Downs's testimony addressed two possible violations of the noncompete clause: (a) meeting with customers that he served for Smith & Nephew; and (b) putting former customers in contact with DePuy representatives.

20

### a. Continued Contact with Former Customers

Downs testified that he met with several former customers after leaving Smith & Nephew. (Tr. 130:5-13.) First, Downs testified that he travelled with Dr. Marvin Kym ("Dr. Kym") to Las Vegas, where Dr. Kym attended a meeting sponsored by DePuy with Defendant Kym. (Tr. 130:11-131:16; see also Hr'g Ex. 21; Tr. 140:22-25.) Downs maintained that he went to Las Vegas simply to play golf with Dr. Kym.

> S & N:    Did Mr. Kym go to the DePuy training session with Dr. Kym?
>
> Downs:    Yes, he did.
>
> S & N:    And so is it your testimony that you accompanied Dr. Kym simply to go play golf with him?
>
> Downs:    Yes, he called and asked me if I wanted to go and play golf.

(Tr. 131:17-20.)

Second, Downs testified that he travelled to a meeting in Seattle, Washington, with Dr. Timothy J. Flock ("Dr. Flock") and Defendant Kym. (Tr. 132:5-23; see also Hr'g Ex. 31.) Downs testified that Dr. Flock attended a demonstration of DePuy products during that trip, (Tr. 140:4-11), but that he only showed Dr. Flock products that do not compete with Smith & Nephew products. (Tr. 131:24-132:13.)

Third, Downs testified that he travelled with Dr. Dietrich to a DePuy-related event in Ellensburg, Washington.[5] (Tr. 140:17-21; <u>see also</u> Hr'g Ex. 21.)  Downs testified that he made the four-hour drive to the location of the event so that he and Dr. Dietrich could go fishing together.  (Tr. 141:4-9.)

### b.  Putting Former Customers in Contact with DePuy Representatives

Downs testified that, when former customers had called him asking about DePuy products, he would tell the customers whom to contact at DePuy because:  "I owe them that."  (Tr. 138:9-19.) Downs also testified to a specific occasion when he did put a former customer in contact with Kym.  When Dr. Flock called Downs about "DePuy uni knees," Downs called Kym and told Kym to call Dr. Flock about the Depuy uni knee.[6]

    S & N:    Have you ever discussed DePuy uni knees with
              Dr. Flock?

    Downs:    No, Dr. Flocked [sic] called me asking me
              about a uni knee, and I called Brian [Kym]
              and told Brian [Kym] he needed to speak to
              Dr. Flock about a uni knee because I told
              Dr. Flock I couldn't talk with him about it.

    S & N:    But you directed him to, when you say Brian,
              you mean Mr. Kym?

    Downs:    Right, he's the local DePuy rep.

---

[5] Corbett and Dr. Olscamp were also at the event in Ellensburg, Washington. (<u>See</u> Hr'g Ex. 21; Tr. 140:17-21.)
[6] Kym testified that he contacted Dr. Flock about DePuy products after Downs suggested that he do so.  (Tr. 225:1-226:18; <u>see also</u> Hr'g Ex. 47.)

| S & N: | Okay. And you believe that Mr. Kym could assist Dr. Flock with any questions he had about DePuy products? |
|---|---|
| Downs: | He should be able to, yeah. |

(Tr. 141:15-25.)

Downs testified that he does not believe that putting former customers in contact with DePuy representatives is a violation of his noncompete agreement with Smith & Nephew.

| S & N: | Is it your testimony that assisting your former customers getting into contact with DePuy sales representatives is not diverting business? |
|---|---|
| Downs: | No. I mean I send them to all kinds of people. I have done that my entire career. If they call and ask me about a product that they're not happy [sic], I will say you need to call this [sic], I think this is a better option for you. I have done that forever. |
| S & N: | But you have directed them to DePuy sales [sic] also? |
| Downs: | Sure, and Stryker and Zimmer. |

(Tr. 145:16-25.)

## C. TESTIMONY OF JAMES JOSEPH WORKLAND, JR.

Workland's testimony addressed two topics: (1) Workland's noncompete clause with Smith & Nephew; and (2) the territory Workland serves for A1A.

### 1. Workland's Noncompete Clause with Smith & Nephew

Smith & Nephew asked Workland about his noncompete agreement with Smith & Nephew. (Tr. 162:6-164:10; see also Hr'g

Ex. 12.)  Workland testified that he received no payment for signing the agreement, that he continued to work for Smith & Nephew after signing the agreement, and that he had done some training with Smith & Nephew after signing the agreement. (Tr. 163:11-164:10.)

### 2.  The Territory Workland Serves for A1A

Workland acknowledged that the territory in his contract with A1A consists of two hospitals, and that Corbett listed these same two hospitals as the territory that Workland served for Smith & Nephew in an earlier email to Eva.  (Tr. 167:6-168:23; compare Hr'g Ex. 35, with Hr'g Ex. 10.)  Smith & Nephew then asked Workland if Corbett had any influence on the territory Workland serves for A1A, and Workland replied:  "He had none to my knowledge."  (Tr. 168:24-169:1.)

Smith & Nephew then produced two email chains impeaching Workland's testimony.  (Tr. 169:16-171:21.)  In the email chains, two different A1A employees tell Workland that Corbett reviewed and gave input on Workland's territory.  The email Workland received from an A1A employee on April 5, 2012, states:

> We had hoped to have your current territory defined and presented to you for review by now, however with Tom[] [Corbett's] vacation this has been delayed to allow Tom [Corbett] to review it first.  Once Tom [Corbett] has approved it [sic] we will be sending it to you for your review as well.

(Hr'g Ex. 36; Tr. 170:17-19.)  The email Workland received from
a different A1A employee on April 12, 2012, states:  "The
territories were established based on Tom[] [Corbett's] input."
(Hr'g Ex. 37.)

After being confronted with those emails, Workland claimed
that there was no indication that Corbett had any influence on
his territory.

> S & N:      But you have two people telling you that Tom
>             [Corbett] has had input into this, correct?
>
> Workland:   That's what they told me.
>
> S & N:      Based on what they told you, you have no
>             independent facts to establish that Tom
>             [Corbett] didn't have input into it?
>
> Workland:   No, and nor do I have any that indicated he
>             did.
>
> S & N:      You have these two e-mails that indicate he
>             did, correct?
>
> Workland:   It says it on [sic] emails.

(Tr. 172:14-22.)

## D. TESTIMONY OF BRIAN CRAIG KYM

Kym's testimony addressed (1) his noncompete agreement with
Smith & Nephew, (2) his transition to A1A, and (3) his current
actions on behalf of A1A.

First, Kym testified that he had not received any money for
signing his noncompete agreement with Smith & Nephew.
(Tr. 224:1-6.)

Second, Kym testified about Corbett's influence on the territory Kym serves for A1A.  Upon being asked whether he knew if Corbett was involved in determining his territory for A1A, Kym responded:  "No, I had no knowledge he had anything to do with it."  (Tr. 216:18-20.)

Smith & Nephew impeached that testimony.  Smith & Nephew produced an email that Kym received on April 6, 2012, in which an A1A employee states that A1A is waiting for Corbett to approve Kym's territory:

> We had hoped to have your current territory defined and presented to you for review by now, however with Tom[] [Corbett's] vacation this has been delayed to allow Tom [Corbett] to review it first.  Once Tom [Corbett] has approved it [sic] we will be sending it to you for your review as well.

(Hr'g Ex. 45; Tr. 217:1-18.)  In response, Kym stated that he received the email, but that:  "I simply do not remember this e-mail."  (Tr. 217:19-24.)

Third, Kym testified that he is currently selling DePuy products to customers that he formerly served for Smith & Nephew.  (Tr. 222:2-223:12.)

**E. TESTIMONY OF MICHAEL JAY BARR**

Barr testified regarding (1) his relationship with Smith & Nephew, and (2) his current actions on behalf of A1A.

First, Barr testified that he did not receive any form of payment for signing his noncompete agreement with Smith &

Nephew.  (Tr. 236:7-17.)  Barr also testified that he did not receive a letter from Smith & Nephew that waived his noncompete agreement.  (Tr. 235:17-19, 236:18-22.)

Second, Barr testified that his contract with A1A identifies a territory consisting of a facility and doctors that Barr served while at Smith & Nephew.  (Tr. 232:19-233:16; see also Hr'g Ex. 48.)  Barr further testified that he is currently selling DePuy products to the doctors in that territory, and that those doctors now use more DePuy products than they did before he started working for A1A.  (Tr. 234:12-235:16.)

**F. TESTIMONY OF ALLEN LEWIS KEPLER**

Kepler is Smith & Nephew's Regional Vice President for the West Region.  (Tr. 249:11-12.)  Kepler's testimony addressed (1) the waiver letters received by Workland and Kym, and (2) the effect that Defendants' departure had on Smith & Nephew.

**1.  The Waiver Letters Received by Workland and Kym**

Kepler's testimony made reference to the email sent to Kremer, Corbett, and Downs that was sent with waiver letters for Workland and Kym.  That email stated:  "Ben [Kremer], please sign each letter in the space provided and send via FedEx with a copy of the Service/Sales Rep [sic] agreement for reference.  I will need signed copies of the letter returned to my attention via scan/fax at your convenience."  (Hr'g Ex. 28.)  In reference to that email, the following exchange occurred:

| S & N: | And these letters were never signed, were never FedExed with a copy of a sales/service rep agreement [sic] to these individuals, were they? |
|---|---|
| Kepler: | They were not. |

(Tr. 345:6-20.)

Furthermore, Kepler testified that he, and not Kremer, had the authority to sign the waiver letters:

| S& N: | If waiver letters of this sort were to go out to someone within your organization, who would have responsibility for signing those type [sic] letters? |
|---|---|
| Kepler: | The manager with that group or [sic] rep reports to. |
| S & N: | Was Mr. Kremer the manager of this group? |
| Kepler: | He was not. |
| S & N: | Who was? |
| Kepler: | As of February, Tom and Barrett and that whole group was [sic] reporting directly to me. |
| S & N: | They reported directly to you. So it would have been your responsibility to sign these? |
| Kepler: | Correct. |

(Tr. 347:5-16.) Kepler never signed the waiver letters addressed to Workland and Kym. (See Tr. 347:17-25.)

**2. The Effect of Defendants' Departure on Smith & Nephew**

Kepler testified (1) that DePuy was a main competitor of Smith & Nephew, (2) that Smith & Nephew sales have suffered losses since Defendants left Smith & Nephew, and (3) that

customers refused to meet with Kepler after Defendants' departure.

First, Kepler testified that DePuy is one of Smith & Nephew's biggest competitors in the area that Defendants served for Smith & Nephew, (Tr. 252:3-13), and that A1A is DePuy's distributor in the area that Defendants served for Smith & Nephew. (Tr. 252:14-20.)

Second, Kepler testified that Smith & Nephew's business began to suffer the month after he received Defendants' resignations. (Tr. 279:1-4.)

Finally, Kepler testified that, after Defendants left Smith & Nephew, Smith & Nephew customers formerly served by Defendants would not contact him.

> S & N:    Mr. Kepler, did you, in fact, send out letters to the doctors that [sic] were listed in that last sheet that we just looked at [and who were Smith & Nephew customers served by Defendants]?
>
> Kepler:   We did.
>
> S & N:    To every one?
>
> Kepler:   To every one of those, yes.
>
> S & N:    And what did you ask those doctors in that letter?
>
> Kepler:   The letter – that letter was more about the rumors in the marketplace around us closing shop, closing the office, no longer being available.  That letter was addressing those rumors and giving contact information for those surgeons to call if they had any

> questions about service or to clarify any of the rumors.

S & N: What was [sic] your intention to do in follow-up of those letters?

Kepler: Well, a couple of weeks later, I then went out to the Spokane market, and I went around to each of those different offices, tried to meet them. I didn't have an appointment, but then wrote a personal note to each one of them.

S & N: How many surgeons that you sent letters to actually met with you?

Kepler: Zero.

S & N: Did you get any other sort of response from any of those surgeons?

Kepler: Nothing at all.

S & N: Who had the relationship – the best relationship with those surgeons you sent the letters to?

Kepler: By far, Tom [Corbett] and Barrett [Downs].

(Tr. 284:18-285:17.)

## G. TESTIMONY OF DAVID TULLY EVA

Eva is the president of A1A,[7] Avenue Medical, and MD Systems. (Tr. 364:10-11.) A1A and MD Systems are involved in the distribution of DePuy products. (Test. of Kepler, Tr. 252:14-20; Hr'g Ex. 17 ¶ 3(B); Hr'g Ex. 32 ¶ 3(B).) Avenue Medical sells products that do not compete with Smith & Nephew products. (See Tr. 364:24-365:12, 375:6-15.)

---

[7] Eva is also the sole owner of A1A. (Eva Dep., ECF No. 136-10, at 25.)

Among other things, Eva testified on cross-examination about the importance of the waiver letters received by Workland and Kym.

> S & N: Is it your position that A1A relied on a waiver letter of some sort to put Jim Workland and Brian Kym back in their former territories for Smith & Nephew?
>
> Eva: Yes.
>
> S & N: Have you seen that waiver letter?
>
> Eva: Yes.
>
> S & N: You realize that the waiver letter is not signed?
>
> Eva: I do realize that, yes.
>
> S & N: Did you ask Smith & Nephew for a signed copy of the waiver letter?
>
> Eva: No.

(Tr. 397:16-398:13.)

Eva then acknowledged that Barr was also allowed to serve immediately the territories Barr served for Smith & Nephew, even though Eva knew that Barr had not received a waiver letter. (Tr. 398:11-399:25.) Eva stated that "my assumption was that Smith & Nephew treated their employees and their contracted employees the same, therefore, I felt that since they released Mr. Workland and Mr. Kym [sic] that a release from Mr. Barr was forthcoming." (Tr. 399:19-22.) Eva admitted that he did not contact Smith & Nephew for clarification. (Tr. 399:18-25.)

## III. CONCLUSIONS OF LAW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). In light of this purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Id. (quoting Camenisch, 451 U.S. at 395) (internal quotation marks omitted).

When considering whether to grant a preliminary injunction, a district court must balance the following four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012) (citing Tenke Corp., 511 F.3d at 542).

In the case currently before the Court, Plaintiff claims that Defendants are violating their noncompete clauses by diverting customers they served for Smith & Nephew. In support of this claim, Plaintiff argues that all four factors favor

32

granting a preliminary injunction. (Pl.'s Appl. for Prelim. Inj., ECF No. 102.) Defendants counter that a preliminary injunction should not be granted for the sole reason that Plaintiffs do not have a strong likelihood of success on the merits. (See ECF No. 103; ECF No. 105; ECF No. 150; ECF No. 152.)

The Court agrees with Plaintiff that the final three factors weigh in favor of granting a preliminary injunction. Regarding the second factor, Plaintiff claims that it will suffer irreparable harm because it relies on the relationships that its sales representatives develop with customers to sell its products. (Pl.'s Appl. for Prelim. Inj., ECF No. 102, at 21.) The fact that no customers served by Corbett's team would meet with Kepler indicates that Smith & Nephew has lost customer goodwill. (See Tr. 285:12-20.) The Court agrees that Plaintiff's resulting loss of customer goodwill constitutes irreparable harm because an injury "is irreparable if it is not fully compensable by monetary damages," Tenke Corp., 511 F.3d at 550 (quoting Overstreet, 305 F.3d at 578) (internal quotation marks omitted), and the "loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992).

Regarding the third factor, Plaintiff argues that the preliminary injunction will not cause substantial harm to third parties because the medical providers approached by Defendant can simply continue to buy products from Smith & Nephew. (Pl.'s Appl. for Prelim. Inj., ECF No. 102, at 22-23.) The Court agrees with Plaintiff because Defendants have provided no evidence suggesting that the preliminary injunction would harm third parties. See Tenke Corp., 511 F.3d at 551 (finding no substantial harm in enforcing a noncompete agreement because potential customers could still obtain the services.)

Regarding the fourth factor, Plaintiff points out that Tennessee and the Sixth Circuit recognize a public interest in enforcing contracts as written. (Pl.'s Appl. for Prelim. Inj., ECF No. 102, at 23 (citing Tenn. Code Ann. § 47-50-112 and Tenke Corp., 511 F.3d at 551).) The Court agrees with Plaintiff. As in Tenke Corporation, "issuing the preliminary injunction would hold Defendants to the terms of the bargain they entered into" and, therefore, promote public policy. See Tenke Corp., 511 F.3d at 551.

Plaintiff, however, still must establish that there is a strong likelihood that they will succeed on the merits. Mich. State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997) ("[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed."). As a

result, this Order first considers which law to apply in evaluating whether Plaintiff has a strong likelihood of succeeding on the merits. This Order then considers whether Plaintiff has a strong likelihood of proving that Corbett and Downs are violating the noncompete clause in the Sales Representative Agreement. Finally, this Order considers whether Planiff has a strong likelihood of proving that Workland, Kym, and Barr are violating the noncompete clauses in their Sales/Service Representative Agreements.

### A. CHOICE OF LAW

In considering whether to grant a preliminary injunction, the Sixth Circuit applies state law to determine if the plaintiff has a strong likelihood of success on the merits. Tenke Corp., 511 F.3d at 541 (applying state law to a dispute over a noncompete clause).

In a diversity case, federal courts must apply the conflict-of-law rules of the forum state. Johnson v. Ventura Grp., Inc., 191 F.3d 732, 738 (6th Cir. 1999) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941)); see also Hardy v. Reynolds & Reynolds Co., 311 F. App'x 759, 761 (6th Cir. 2009). Regarding contract interpretation, Tennessee applies the law of the state in which the contract was executed unless there is an indication of contrary intent by the parties. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App.

1999) (citing <u>Ohio Cas. Ins. Co. v. Travelers Indem. Co.</u>, 493 S.W.2d 465, 467 (Tenn. 1973)).

The Court will consider which state's law to apply to the Sales Representative Agreement signed by Corbett and Downs. This Order will then consider which state's law to apply to the Sales/Service Representative Agreements signed by Workland, Kym, and Barr.

### 1. The Sales Representative Agreement Is Governed by Tennessee Law.

A choice-of-law clause in the Sales Representative Agreement signed by Corbett and Downs indicates that the parties intended Tennessee law to govern the contract. (Hr'g Ex. 1 ¶ 11.) Neither party argues that Tennessee law should not apply to the noncompete clause in the Sales Representative Agreement signed by Corbett and Downs. (<u>See, e.g.</u>, Pl.'s Appl. for Prelim. Inj., ECF No. 102, at 102-03; Defs.' Pre-Hr'g Mem., ECF No. 103, at 32.) The Court, therefore, will apply Tennessee law to the Sales Representative Agreement signed by Corbett and Downs.

### 2. The Court Does Not Need To Determine Which State's Law Applies to the Sales/Service Representative Agreements.

Choice-of-law clauses in the Sales/Service Representative Agreements signed by Workland, Kym, and Barr indicate that the parties intended Tennessee law to govern the contracts. (Hr'g

Ex. 12 ¶ 11; Hr'g Ex. 13 ¶ 11; Hr'g Ex. 14 ¶ 11.) Defendants, however, argue that Washington law should govern the noncompete clauses in the Sales/Service Representative Agreements signed by Workland, Kym, and Barr. (Defs.' Pre-Hr'g Mem., ECF No. 103, at 29-32.)

The Court does not need to determine if Tennessee law or Washington law governs the Sales/Service Representative Agreements signed by Workland, Kym, and Barr. As explained below, there is a strong likelihood that Plaintiffs will succeed on the merits regardless of whether Tennessee law or Washington law is applied. The Court, therefore, will consider both Tennessee law and Washington law regarding the Sales/Service Representative Agreements signed by Workland, Kym, and Barr.

**B. CORBETT AND DOWNS**

Based on the testimony and evidence presented to the Court, there is a strong likelihood that Plaintiffs will be able to prove the following: that the noncompete clause in the Sales Representative Agreement is enforceable; that Smith & Nephew can enforce the noncompete clause without making payments to Corbett and Downs because Corbett and Downs were terminated for cause; and that the noncompete clause is being violated by Corbett and Downs.[8]

---

[8] Defendant's also argue that Smith & Nephew waived the noncompete clause in the Sales Representative Agreement because it sometimes allows sales representatives to sell competing products. (Defs.' Pre-Hr'g Mem., ECF

**1. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that the Noncompete Clause in the Sales Representative Agreement Will Be Enforced.**

Noncompete agreements are disfavored in Tennessee and are strictly construed in favor of the employee. <u>Murfreesboro Med. Clinic, PA v. Udom</u>, 166 S.W.3d 674, 678 (Tenn. 2005). A noncompete agreement, however, is enforceable if it has the following characteristics: (1) it protects a legitimate business interest; (2) it is reasonable in light of the hardship to the employee and the public; and (3) it imposes time and territorial limits that are no greater than necessary to protect the employer's legitimate business interest. <u>See</u> <u>Murfreesboro Med. Clinic</u>, 166 S.W.3d at 678; <u>Columbus Med. Servs., LLC v. Thomas</u>, 308 S.W.3d 368, 384 (Tenn. Ct. App. 2009).

As explained below, there is a strong likelihood that Plaintiff will be able to prove that the noncompete clause protects a legitimate business interest, that the noncompete clause is reasonable, and that the noncompete clause imposes time and territorial limits that are no greater than necessary.

---

No. 103, at 32-33.) This argument is irrelevant. The noncompete clause is not triggered until Corbett and Downs are terminated. (Sales Representative Agreement, Hr'g Ex. 1, ¶¶ 6(d)-(e).) Therefore, it does not matter if Corbett and Downs are allowed to sell noncompeting products before being terminated.

**a. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that the Noncompete Clause in the Sales Representative Agreement Protects a Legitimate Business Interest.**

A "threshold question" in deciding whether to enforce a noncompete agreement is whether the employer is protecting a legitimate business interest. Columbus Med. Servs., 308 S.W.3d at 384 (quoting Vantage Tech., 17 S.W.3d at 644) (internal quotation marks omitted). An employer will be protecting a legitimate business interest if, in the absence of the noncompete agreement, the employee will gain an unfair advantage in future competition with the employer. Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 473 (Tenn. 1984); Columbus Med. Servs., 308 S.W.3d at 384-85.

In determining whether an employee will have an unfair advantage over the employer in future competition, courts consider the following factors: (1) whether the employer provided specialized training to the employee; (2) whether the employer gave the employee access to trade secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee. Hasty, 671 S.W.2d at 472-73; Columbus Med. Servs., 308 S.W.3d at 384.

In the case presently before the Court, there is a strong likelihood that Plaintiff will be able to demonstrate that the

noncompete clause in the Sales Representative Agreement protects a legitimate business interest. First, Smith & Nephew, like other medical-device manufacturers, must provide specialized training to assure that its sales representatives can properly demonstrate how to use its medical devices. (Test. of Kepler, Tr. 267:6-268:8 (describing required training for sales representatives on surgical techniques); see also Test. of Corbett, Tr. 77:15-17; Test. of Eva, Tr. 395:2-11, 402:8-10.)

Second, Corbett and Downs had access to confidential information, such as pricing. (Tr. 265:20-267:5 (Kepler describing Smith & Nephew's password-protected Sales Life program, which gives sales representatives access to pricing information); Tr. 270:2-8 (Kepler stating that he expected pricing to be confidential).)

Third, Smith & Nephew relies on the relationships between its sales representatives and its customers to sell its products. Corbett and Downs had close personal relationships with the customers they served for Smith & Nephew. (See Test. of Corbett, Tr. 82:12-17; Test. of Downs, Tr. 124:7-12; Test. of Kepler, Tr. 285:18-20; Test. of Eva, Tr. 285:12-20.) Corbett also acknowledged the importance of sales representatives in building the reputation of, and goodwill for, Smith & Nephew: in a letter to Smith & Nephew, Corbett reminds Smith & Nephew that he and Downs "built Smith & Nephew's excellent service

reputation and goodwill in [their service area] for the past seventeen years." (Letter from Corbett, Hr'g Ex. 25, at 2.) In addition, customers closely associated Smith & Nephew products with Corbett and Downs, as demonstrated by the fact that none of the customers, whom Kepler sent letters to and whom Kepler attempted to visit after Corbett and Downs left Smith & Nephew, contacted Kepler. (See Test. of Kepler, Tr. 284:18-285:20.) As a result, this is a case in which "the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer" such that "[t]he employee in essence becomes 'the face' of the employer." See Vantage Tech., 17 S.W.3d at 645.

Based on the testimony and evidence presented to the Court, in the absence of the noncompete clause in the Sales Representative Agreement, Corbett and Downs "would gain an unfair advantage in future competition with the employer." See Hasty, 671 S.W.2d at 473. Plaintiff, therefore, has a strong likelihood of proving that the noncompete clause protects a legitimate business interest. See id.

**b. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that the Noncompete Clause in the Sales Representative Agreement Is Reasonable.**

A noncompete agreement is enforced only if it is reasonable. Murfreesboro Med. Clinic, 166 S.W.3d at 678. In deciding whether a noncompete agreement is reasonable, the

41

following four factors are considered by courts: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest.  Id.

In the case presently before the Court, there is a strong likelihood that Plaintiff will be able to demonstrate that the noncompete clause in the Sales Representative Agreement signed by Corbett and Downs is reasonable.  First, regarding consideration, Plaintiff paid a signing bonus to Corbett and Downs of $150,000.  (Tr. 21:19-21.)  Second, regarding threatened danger to the employer in the absence of the noncompete agreement, Plaintiff would be in danger of losing the goodwill that it developed through its sales representatives.  (See supra Part III.B.1.a.)  Third, regarding the employee's economic hardship, there is little concern in this case:  Eva paid Corbett and Downs handsomely to sit out for a year.  (See Test. of Corbett, Tr. 113:17-20; Test. of Downs, Tr. 134:10; Test. of Eva, Tr. 372:3-8, 375:16-376:5, 393:1-11.)  Fourth, Tennessee recognizes the need for noncompete agreements in the medical industry, so noncompete agreements are generally not considered inimical to the public interest.  See Hanger Prosthetics & Orthotics E., Inc. v. Kitchens, 280 S.W.3d 192, 202 (Tenn. Ct. App. 2008) (finding a legitimate business

interest regarding a company that manufactured and sold prosthetic, orthopedic, and surgical devices); Vantage Tech., 17 S.W.3d at 646 n.1 (finding a legitimate business interest regarding a company that provided medical devices for ophthalmologists).

The Court, therefore, finds that Plaintiff has a strong likelihood of proving that the noncompete clause in the Sales Representative Agreement is reasonable.

**c.  There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that the Noncompete Clause in the Sales Representative Agreement Imposes Time and Territorial Limits that Are No Greater than Necessary.**

In order to be enforced, a noncompete clause's "time and territorial limits must be no greater than necessary to protect the business interest of the employer." Columbus Med. Servs., 308 S.W.3d at 384 (quoting Murfreesboro Med. Clinic, 166 S.W.3d at 678) (internal quotation marks omitted).

Defendants argue that the noncompete clause is too broad to be enforced because it potentially covers the sale of products that do not compete with Smith & Nephew products. (Defs.' Pre-Hr'g Mem., ECF No. 103, at 18.)

Regardless of whether it covers the sale of noncompeting products, the noncompete clause imposes time and territorial limits that are no greater than necessary to protect Smith & Nephew's legitimate business interest. The noncompete clause

lasts for only one year. (Sales Representative Agreement, Hr'g Ex. 1, ¶ 16.) Tennessee courts have enforced noncompete agreements for three or five years. See, e.g., Vantage Tech., 17 S.W.3d at 648 (finding a three-year restriction reasonable). Furthermore, MD Systems found it worthwhile to pay Corbett and Downs to sit out for one year to ensure that they would work for MD Systems after that year. (See Test. of Eva, Tr. 372:3-8, 375:16-376:5, 393:1-11; Test. of Corbett, Tr. 113:17-20; Test. of Downs, Tr. 134:10.)

In addition, it is necessary to restrict Corbett and Downs from contacting former customers they served for Smith & Nephew. Tennessee courts recognize that employers often need to restrict former employees from serving the customers that the employee formerly served. See, e.g., Vantage Tech., 17 S.W.3d at 648 (modifying a restrictive covenant to cover only hospitals in which the plaintiff provided services). Smith & Nephew faces competition from other medical-device distributors for the customers Corbett and Downs served, (see Test. of Kepler, Tr. 252:3-13; Test. of Eva, Tr. 375:21-24, 393:4-7), and Corbett and Downs have an advantage over Smith & Nephew due to the personal relationships they developed while working with those customers. See supra Part III.B.1.a. As a result, restricting Corbett and

Downs from contacting their former customers is likely reasonable.[9]

The Court, therefore, finds that Plaintiff has a strong likelihood of proving that the time and territorial limits of the noncompete clause are "no greater than necessary to protect the business interest of the employer." See Columbus Med. Servs., 308 S.W.3d at 384 (quoting Murfreesboro Med. Clinic, 166 S.W.3d at 678) (internal quotation marks omitted).

In summary, Plaintiff has a strong likelihood of proving that the noncompete clause in the Sales Representative Agreement protects a legitimate business interest, that the noncompete clause is reasonable, and that the noncompete clause imposes time and territorial limits that are no greater than necessary. Therefore, there is a strong likelihood that the noncompete clause in the Sales Representative Agreement will be enforced. See Bays, 668 F.3d at 818 (citing Tenke Corp., 511 F.3d at 542).

**2.    There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that Corbett and Downs Were Terminated for Cause.**

Defendants argue that Corbett and Downs were not terminated for cause. (Defs.' Pre-Hr'g Mem., ECF No. 103, at 19.) As a result, Defendants argue, Smith & Nephew cannot enforce the

---

[9] It is also reasonable to restrict Corbett and Downs from contacting former customers because Corbett and Downs are likely claiming to be selling noncompeting products to former customers when they are actually trying to put those customers in contact with DePuy representatives. See supra Part III.B.1.a.

noncompete agreement without making monthly payments equivalent to seventy-five percent of Corbett's and Downs's salary from the last twelve months of their employment with Smith & Nephew. (Id.; see also Sales Representative Agreement, Hr'g Ex. 1, ¶ 16(b).) Smith & Nephew is not making those payments, so Defendant argues that Smith & Nephew cannot enforce the noncompete clause. (Defs.' Pre-Hr'g Mem., ECF No. 103, at 19.)

Defendant's argument is not persuasive. There is a strong likelihood that Smith & Nephew can prove the following: that termination for not exercising best efforts constitutes termination for cause; and that Corbett and Downs did not exercise best efforts during the term of the Sales Representative Agreement.

Regarding whether it terminated Corbett and Downs for cause, Smith & Nephew sent Corbett a letter indicating that it was terminating Corbett and Downs for cause. (Letter from Smith & Nephew's Counsel, Hr'g Ex. 54.) The letter states that Corbett and Downs had not used their "best efforts" to perform their contractual obligations to Smith & Nephew. (Id. (quoting Sales Representative Agreement, Hr'g Ex. 1 ¶ 3(a)) (internal quotation marks omitted).)

Failing to use best efforts is likely a material breach of the contract and a basis for termination with cause. The Sales Representative Agreement states that sales representatives must

46

use "best efforts" to promote and sell Smith & Nephew's

products. (Hr'g Ex. 1 ¶ 3(a).) The Sales Representative

Agreement also states that any material breach of the contract

gives Smith & Nephew the right to terminate the contract. (Hr'g

Ex. 1 ¶ 6.) Therefore, Smith & Nephew terminated Corbett and

Downs for not using their "best efforts," which is a material

breach of the contract and grounds for termination with cause.

Regarding whether Corbett and Downs used their best

efforts, Plaintiff points out that, among other things, Corbett

and Downs attempted to resign before the end of the term of the

Sales Representative Agreement. (See Letter from Smith &

Nephew's Counsel, Hr'g Ex. 54.) The term of the Sales

Representative Agreement is from August 8, 2010, to December 31,

2015. (Sales Representative Agreement, Hr'g Ex. 1, ¶ 6(a).)

While there are provisions in the agreement giving Smith &

Nephew the right to terminate the agreement before December 31,

2015, there is no provision giving Corbett and Downs the right

to do so. (Id.) In its letter to Corbett and Downs, Smith &

Nephew states that it received a resignation letter from Corbett

on April 28, 2012, and a resignation letter from Downs on May 2,

2012. (Letter from Smith & Nephew's Counsel, Hr'g Ex. 54; see

also Hr'g Ex. 18.) The attempts by Corbett and Downs to resign

from Smith & Nephew before the end of their contract likely

demonstrate that they had stopped using "best efforts" to

promote Smith & Nephew products in the area they served for

Smith & Nephew. (<u>See</u> Sales Representative Agreement, Hr'g Ex.

1, ¶ 3(a).)

Therefore, the evidence before the Court indicates that

Corbett and Downs were terminated for cause. According to the

terms of the Sales Representative Agreement, Smith & Nephew can

enforce the noncompete clause without making any payments to

Corbett and Downs. Plaintiff, therefore, has a strong

likelihood of proving that Corbett and Downs were terminated for

cause. <u>See</u> <u>Bays</u>, 668 F.3d at 818 (citing <u>Tenke Corp.</u>, 511 F.3d

at 542).

### 3. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that Corbett and Downs Violated the Noncompete Clause in the Sales Representative Agreement.

The noncompete clause in the Sales Representative Agreement

does not allow Corbett and Downs to: "[c]all upon, solicit, or

initiate efforts to divert in any way customers served by Sales

Rep on behalf of [Smith & Nephew] in the Restricted area (as

defined herein)." (Hr'g Ex. 1 ¶ 16.) This restriction lasts

for one year from the end of Smith & Nephew's employment of

Corbett and Downs. (<u>See</u> <u>id.</u>)

Based on the testimony and evidence presented to this

Court, there is a strong likelihood that Plaintiff will be able

to show that Corbett and Downs did not intend to honor their

noncompete agreement with Smith & Nephew; that they had a financial incentive not to honor their noncompete agreement; and that they violated their noncompete agreement by directing former customers to Workland, Kym, and Barr, who were then selling DePuy products for A1A.

### a. Corbett and Downs Intended To Circumvent Their Noncompete Agreement with Smith & Nephew.

An email exchange between Corbett, Downs, and Eva demonstrates that both Corbett and Downs intended to circumvent their noncompete agreement. This email exchange occurred in February of 2012, (ECF No. 95-1; see also Hr'g Ex. 10), approximately two months before Corbett and Downs gave notice that they were leaving Smith & Nephew. (See Hr'g Ex. 18.)

On February 10, 2012, Corbett sent an email to Eva and attached "a basic overview of our group that may help in discussions." (Hr'g Ex. 10.) The document attached to that email concludes by stating that: "Our whole group has a strong non-compete covenant, however, I feel your current personnel infrastructure could help with this obstacle if they are willing." (Id.)

On February 12, 2012, Corbett forwarded that email to Downs, stating: "[h]ere is what I sent Dave [Eva]." (Id.) The message to Downs ends with the following instruction: "Please

delete after reviewing.  We don't need any legal repercussions."
(Id.)

The emails sent by Corbett on February 10, 2012, and
February 12, 2012, are proof that Corbett did not intend to
honor his noncompete agreement.  The emails indicate not only
that Corbett hoped to use Eva's other employees to circumvent
the "obstacle" created by his noncompete agreement with Smith &
Nephew, but also that Corbett realized that there may be "legal
repercussions" for suggesting as much to Eva.

On February 13, 2012, Downs responded to Corbett's email.
(ECF No. 95-1 at 1.)  In response to Corbett's direction to
"delete after reviewing" to avoid "any legal repercussions,"
Downs said:  "This message will self destruct [sic] in 30
seconds!!"  (Id.)  The February 13 email suggests that Downs was
both aware that there might be, and shared Corbett's desire to
avoid, "legal repercussions" resulting from Corbett's initial
email to Eva.

Downs also indicated that he was frustrated by the
possibility that he may have to honor his noncompete agreement
with Smith & Nephew.  Downs left a voicemail for Corbett on June
19, 2012, (see ECF No. 114-2 at 1 (File No. 2546)), which is
after Smith & Nephew had indicated that it was investigating
whether Corbett and Downs were violating their noncompete
agreement.  (Hr'g Ex. 54 at 3.)  In the voicemail, Downs says:

give it a couple of weeks man and then I'm jumping in
the room [operating room].  I'm going to go over and
watch cases if not next week the week after and get up
and go on this stuff so I can start covering — screw
it — see what happens.

(Pl.'s Post-Hr'g Mem., ECF No. 145, at 8.)

In their post-hearing memorandum, Defendants admit that
Downs said in that voicemail that he would start observing
surgeries in which DePuy products were being used, but argue
that Downs said this out of frustration at not being told
whether Smith & Nephew had decided to take legal action against
him.  (Defs.' Post-Hr'g Mem., ECF No. 150, at 8.)  The
implication from Downs's voicemail, and Defendants' argument
regarding that email, is that Downs intended to violate his
noncompete agreement if Smith & Nephew took no legal steps to
stop him.

The evidence before the Court indicates that Corbett and
Downs did not intend to honor the noncompete clause in the Sales
Representative Agreement.

### b.  **Corbett and Downs Had a Financial Incentive To Violate Their Noncompete Agreement with Smith & Nephew.**

According to their contracts with MD Systems, Corbett and
Downs receive a five-percent commission on the net sales from
any new business done by A1A, which distributes DePuy Products.
(Hr'g Ex. 17 ¶¶ 2(B), 3(B); Hr'g Ex. 32 ¶¶ 2(B), 3(B); Test. of
Kepler, Tr. 252:14-20.)  This provision gives Corbett and Downs

a financial interest in new sales of DePuy products that compete
with Smith & Nephew products, (Test. of Corbett, Tr. 62:18-
63:23), and a financial interest in the customers they served
for Smith & Nephew switching to DePuy products. (Test. of
Downs, Tr. 136:10-16.) Corbett even admitted that his five-
percent commission gave him a financial interest in Smith &
Nephew waiving its noncompete agreements with Workland and Kym
because Workland and Kym could then sell DePuy products to the
customers they served for Smith & Nephew. (See Tr. 114:15-
115:12.)

Therefore, the contracts between MD Systems and Corbett and
Downs indicate that Corbett and Downs had a financial incentive
to promote new sales of DePuy products.

**c.   Corbett and Downs Are Likely Violating Their
Noncompete Agreement by Using Workland, Kym, and Barr
To "Initiate Efforts To Divert" Former Customers to
DePuy Products.**

The noncompete agreement signed by Corbett and Downs does
not allow them to "[c]all upon, solicit, or initiate efforts to
divert in any way customers served by [Corbett or Downs] on
behalf of [Smith & Nephew] in the Restricted Area." (Sales
Representative Agreement, Hr'g Ex. 1, ¶ 16(a)(i).)

First, on three occasions, Corbett and Downs accompanied
former customers to DePuy-related events that Workland and Kym
were also attending. On April 26, 2012, Corbett attended a

DePuy event in Seattle, Washington, with Dr. McInnis and Workland. (Test. of Corbett, Tr. 72:25-76:2; see also Hr'g Ex. 20.) In May of 2012, Downs travelled with Dr. Kym to Las Vegas, Nevada, where Dr. Kym attended a DePuy-sponsored event with Defendant Kym. (Test. of Downs, Tr. 130:11-131:20.) And in May of 2012, Downs also travelled to Seattle, Washington, with Dr. Flock and Kym. Dr. Flock attended a demonstration of DePuy products on that trip. (Test. of Downs, Tr. 131:21-132:23, 140:4-11; see also Hr'g Ex. 31.)

There is a strong likelihood that Plaintiff will succeed in showing that Corbett and Downs violated their noncompete agreement with Smith & Nephew on those three occasions. On those three occasions, Corbett and Downs accompanied former customers to events that promoted DePuy products. Additionally, Workland and Kym, who formerly served those clients for Corbett and Downs while at Smith & Nephew, attended those events. (Test. of Corbett, Tr. 74:9-16; Test. of Kym, Tr. 209:8-14.) The evidence before the Court indicates that Corbett and Downs accompanied their former customers to those events to make it more likely that those customers would purchase DePuy products from Workland and Kym. Corbett and Downs, therefore, were "initiat[ing] efforts to divert" former customers to DePuy products in violation of the noncompete clause in the Sales

Representative Agreement.  (See Sales Representative Agreement, Hr'g Ex. 1, ¶ 16(a)(i).)

Second, Corbett and Downs facilitated contact between their former customers and DePuy representatives.  Upon being contacted by a former customer and a DePuy representative about a difficult pricing negotiation involving DePuy products, (see Hr'g Ex. 23; Hr'g Ex. 24), Corbett forwarded one of the emails so that Workland would get involved in the negotiation.  (See Test. of Corbett, Tr. 90:23-24; Hr'g Ex. 24.)  Upon receiving calls from former customers about DePuy products, Downs would tell those customers whom to contact at DePuy.  (Tr. 138:9-19.)  Specifically, when Downs's former customer Dr. Flock called Downs about a DePuy product, Downs testified that he told Kym to call Dr. Flock.  (Tr. 141:15-25.)  By putting former customers in contact with DePuy sales representatives, Corbett and Downs are likely "initiat[ing] efforts to divert" those customers to DePuy products in violation of the noncompete clause in the Sales Representative Agreement.  (See Sales Representative Agreement, Hr'g Ex. 1, ¶ 16(a)(i).)

In summary, the evidence before the Court indicates that Corbett and Downs violated, and continue to violate, their noncompete agreement with Smith & Nephew.  As a result, the Court finds that Plaintiff has demonstrated "a strong likelihood

of success on the merits." See Bays, 668 F.3d at 818 (citing Tenke Corp., 511 F.3d at 542).

All four factors that a court must balance to determine whether to issue a preliminary injunction, therefore, weigh in favor of issuing a preliminary injunction against Corbett and Downs. (See id.) Plaintiff's Application for Preliminary Injunction, (ECF No. 102), therefore, is GRANTED regarding Corbett and Downs.

### C. WORKLAND, KYM, AND BARR

In May of 2010, Workland, Kym, and Barr signed Sales/Service Representative Agreements that contained noncompete clauses. (Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.) Based on the testimony and evidence submitted to the Court, there is a strong likelihood that Plaintiff can prove that those noncompete clauses should be enforced, that those noncompete clauses have not been waived, and that Workland, Kym, and Barr are violating those agreements.

### 1. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that the Noncompete Clauses in the Sales/Service Representative Agreements Should Be Enforced Because Workland, Kym, and Barr Received Consideration.

Defendants argue that the noncompete clauses should not be enforced because Workland, Kym, and Barr received no consideration for signing the Sales/Service Representative Agreements that contain the noncompete clauses. (Defs.' Pre-

Hr'g Mem., ECF No. 103, at 29-32; Def. Barr's Post Hr'g Mem., ECF No. 152, at 2-3, 6, 9.) Regardless of whether Tennessee law or Washington law is applied, there is a strong likelihood that Plaintiff will succeed in showing that Workland, Kym, and Barr received consideration for signing their noncompete clauses.

Under Tennessee law, continued employment is sufficient consideration for a noncompete agreement. <u>Cent. Adjustment Bureau, Inc. v. Ingram</u>, 678 S.W.2d 28, 34 (Tenn. 1984). The Sales/Service Representative Agreements containing the noncompete clauses at issue were signed in May of 2010. (Hr'g Exs. 12-14.) Smith & Nephew continued to employ Workland, Kym, and Barr after May 17, 2010. (<u>See, e.g.</u>, Hr'g Ex. 6 (email from Corbett, dated January 3, 2012, regarding performance in the previous year and listing Workland, Kym, and Barr as recipients); Hr'g Ex. 10 (email from Corbett, dated February 12, 2012, listing the territories served by Workland, Kym, and Barr for Smith & Nephew).) Under Tennessee law, therefore, Workland, Kym, and Barr received sufficient consideration for signing the noncompete clauses in the Sales/Service Representative Agreements.

Defendants argue that Washington law should apply. (Defs.' Pre-Hr'g Mem., ECF No. 103, at 29-32.) If Washington law applies, Defendants argue, the noncompete agreements are unenforceable because continued employment is not sufficient

consideration and Workland, Kym, and Barr received no payment from Smith & Nephew for signing the agreements. (Id. at 29-32 (citing Labriola v. Pollard Grp., Inc., 100 P.3d 791, 794 (Wash. 2004).)

Even if Washington law applies, however, the Court finds that there is a strong likelihood that Plaintiff will be able to prove that Corbett and Downs paid Workland, Kym, and Barr for signing the Sales/Service Representative Agreements. Smith & Nephew paid Corbett and Downs $150,000, contingent on Workland, Kym, and Barr signing noncompete agreements with Smith & Nephew. (Tr. 21:19-22:15.) Under the terms of the Sales/Service Representative Agreement, Corbett and Downs were responsible for providing compensation to Workland, Kym, and Barr, (see Sales/Service Rep. Agreements, Hr'g Exs. 12-14, ¶ 7(a)), and Corbett admitted that he requested and used the $150,000 to pay representatives that worked in the same capacity as Workland, Kym, and Barr. (Tr. 50:4-23.)

Furthermore, Plaintiff may be able to obtain financial records indicating that Corbett and Downs made payments to Workland, Kym, and Barr. While Corbett testified that he cannot remember whether he paid Workland, Kym, or Barr for signing the noncompete agreements, Corbett indicated that his accountant may

have financial records from the relevant time period.[10] (Tr. 56:24-58:6.) In light of the evidence before the Court, and the possibility that Plaintiff can obtain records indicating that such payments were made, the Court finds that there is a strong likelihood that Plaintiff will be able to prove that Corbett and Downs paid Workland, Kym, and Barr for signing the noncompete agreements.

Therefore, under both Tennessee and Washington law, there is a strong likelihood that Plaintiff will succeed in showing that Workland, Kym, and Barr received consideration for signing the noncompete agreements. See Bays, 668 F.3d at 818 (citing Tenke Corp., 511 F.3d at 542).

## 2. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that Smith & Nephew Did Not Waive the Noncompete Clause in the Contracts Signed by Workland, Kym, and Barr.

The analysis is more straightforward regarding Barr than it is regarding Workland and Kym. Regarding Barr, Smith & Nephew never gave any indication that it was waiving the noncompete clause in Barr's contract; unlike Workland and Kym, Barr never received a letter waiving his noncompete agreement.

---

[10] Regarding his financial records, Corbett did testify that: "I don't think it [sic] would show specifically individuals getting paid." (Tr. 58:9-10.) Corbett, however, did not appear to have seen the records and did not demonstrate any understanding of what his financial records contained. (See Tr. 58:1-6.) Furthermore, his testimony was repeatedly impeached at the hearing. As a result, the Court gives very little weight to Corbett's statement about what his financial records may contain.

(Tr. 235:17-19.)  Therefore, Smith & Nephew never waived the noncompete agreement signed by Barr.

Workland and Kym received waiver letters, but the waiver letters were not officially approved by Smith & Nephew.  On April 20, 2012, Smith & Nephew sent an email to Kremer, Corbett, and Downs.  (Hr'g Ex. 28.)  Attached to that email were letters that would waive the noncompete agreements of Workland and Kym. (Id.)  The email directs Kremer, a Smith & Nephew district manager, to sign the letters attached to the email and send those letters to Workland and Kym via FedEx.  (Id.)  Kremer, however, did not sign or send the letters.  (Tr. 345:17-21.) Corbett, who admits that he had a financial interest in having Workland and Kym sell DePuy products, printed the letters and gave them to Workland and Kym.  (Tr. 114:15-115:12.)

Furthermore, Kremer did not have the authority to sign the waiver letters.  (Tr. 347:9-10.)  Corbett and Downs's group reported directly to Kepler, who was the person that had the authority to sign the waiver letters.  (Tr. 347:12-16.)  Kepler never signed the waiver letters addressed to Workland and Kym. (Tr. 347:17-25.)  Since Smith & Nephew neither signed nor authorized the execution of the waiver letters given to Workland and Kym, the waiver letters are not valid and Smith & Nephew

never waived the noncompete agreements signed by Workland and Kym.[11]

In summary, there is a strong likelihood that Plaintiff can prove that Smith & Nephew never waived the noncompete agreements of Barr, Workland, or Kym.  See Bays, 668 F.3d at 818 (citing Tenke Corp., 511 F.3d at 542).

### 3. There Is a Strong Likelihood that Plaintiff Will Be Able To Prove that Workland, Kym, and Barr Are Acting in Violation of the Noncompete Clause in Their Sales/Service Representative Agreements.

The noncompete clauses in the Sales/Service Representative Agreements do not allow Workland, Kym, and Barr to:  "[c]all upon, solicit, or initiate efforts to divert in any way customers served by Service Rep on behalf of [Smith & Nephew] in the Restricted area (as defined herein)."  (Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.)  This restriction lasts for one year from the end of the employment relationship between Smith & Nephew and Workland, Kym, and Barr.  (Hr'g Ex. 12 ¶ 16; Hr'g Ex. 13 ¶ 16; Hr'g Ex. 14 ¶ 16.)

Workland, Kym, and Barr admit that they are selling competing products to customers they served for Smith & Nephew. (Test. of Workland, Tr. 198:23-199:1; Test. of Kym, Tr. 222:1-

---

[11] The parties also make arguments about whether the waivers required consideration under Tennessee law.  (Pl.'s Post-Hr'g Mem., ECF No. 145, at 17-18; Defs.' Post-Hr'g Mem., ECF No. 150, at 15-18.)  The Court does not address those arguments because Smith & Nephew neither signed nor authorized the execution of the letters given to Workland and Kym and, therefore, never waived the noncompete clauses.

15; Test. of Barr, Tr. 233:8-234:25.) They also admit to doing so within one year of leaving Smith & Nephew. (See id.) Workland, Kym, and Barr, therefore, are violating their noncompete agreements with Smith & Nephew.

In summary, the noncompete clauses in the Sales/Service Representative Agreements are enforceable, have not been waived, and are being violated by Workland, Kym, and Barr. As a result, the Court finds that Plaintiff has demonstrated "a strong likelihood of success on the merits." See Bays, 668 F.3d at 818 (citing Tenke Corp., 511 F.3d at 542).

All four factors that a court must balance to determine whether to issue a preliminary injunction weigh in favor issuing a preliminary injunction against Workland, Kym, and Barr. (See id.) Plaintiff's Application for Preliminary Injunction, (ECF No. 102), therefore, is GRANTED regarding Workland, Kym, and Barr.

## IV. CONCLUSION

For the reasons stated above, the Plaintiff's Application for Preliminary Injunction, (ECF No. 102), is GRANTED.

The Court HEREBY ENJOINS Thomas Andrew Corbett, Emory Barrett Downs, James Joseph Workland, Jr., Brian Craig Kym, and Michael Jay Barr from directly or indirectly calling upon, soliciting, or initiating efforts to divert from Smith & Nephew,

the following accounts, as listed in the Complaint for

Injunctive Relief, (see ECF No. 1-2 ¶¶ 34, 37):

| | |
|---|---|
| BILLINGS CLINIC | DEACONESS MEDICAL CENTER |
| BILLINGS CLINIC HOSPITAL | NORTHWEST SPECIALTY HOSPITAL |
| BOZEMAN DEACONESS HOSP | TRI-STATE MEMORIAL HOSP |
| CASTLEVIEW HOSPITAL | VA CENTER |
| PROVIDENCE TOPPENISH HOSPITAL | SUNNYSIDE COMM HOSPITAL |
| CENTRAL WASHINGTON HOSP | WALLA WALLA GENERAL HOSP |
| SURGERY CENTER OF BILLINGS | WASHINGTON STATE UNIVERSITY |
| SIDNEY HEALTH CENTER | WENATCHEE VALLEY CLINIC |
| WASHINGTON CASCADE | WHITMAN HOSPITAL & MEDICAL CEN |
| TRI-CITY REGIONAL SURGERY CENT | SHOSHONE MEDICAL CENTER |
| PUBLIC HOSPITAL DISTRICT NO 1- | WEST PARK HOSPITAL |
| OTHELLO COMM HOSPITAL | YAKIMA VALLEY MEMORIAL HOSPITAL |
| GLENDIVE MEDICAL CENTER | BENEFIS HEALTHCARE WEST CAMPUS |
| GOOD SHEPHERD HOSPITAL | COMM HOSP OF ANACONDA |
| GREAT FALLS CLINIC | SERVICE UNIT DIRECTOR |
| GRITMAN MEDICAL CENTER INC | KAUFMAN, RAYMOND, MD |
| HOLY ROSARY HEALTH CENTER | PROSSER MEMORIAL HOSPITAL |
| HOLY FAMILY HOSPITAL | VALLEY HOSP & MED CUR |
| KADLEC MEDICAL CENTER | CENTRAL UTAH MED CLINIC |
| KENNE WICK GENERAL HOSP | BARRET HOSPITAL AND HEALTHCARE |
| KITITAS VALLEY COMM HOSP | CLARK FORK VALLEY HOSP |
| KOOTENAI MEDIAL CENTER | NORTH STAR C/O BIG SKY SURG C |
| KALISPELL REGIONAL HOSP | BEG SKY SURGERY CTR |
| LEWISTON ORTHOPEDICS | BONNER GENERAL HOSPITAL |
| LIVINGSTON MEM HOSPITAL | HELENA SURGICENTER |
| MARCUS DALY MEM HOSP | PROVIDENCE SRG CTR |
| MID VALLEY HOSPITAL | BENEWAH COMMUNITY HOSPITAL |
| COMMUNITY MEDICAL CENTER | CENTRAL MONTANA SURGERY CENTER |
| BENEFIS HEALTHCARE EAST CAMPUS | WALLA WALLA CLINIC & SURGERY C |
| MOUNT CARMEL HOSPITAL | COUNTWAY, THOMAS M., DPM |
| NEWPORT COMMUNITY HOSP | MISSOULA BONE & JOINT SURGERY |
| NORTH VALLEY HOSPITAL | SPOKANE ORTHOPAEDICS AND |
| OUR LADY OF LOURDES HOSP | NORTHWEST ORTHOPAEDIC SPECIALI |
| FLATHEAD OUTPATIENT | INLAND ORTHOPAEDICS OF SPOKANE |
| ROCKWOOD CLINIC PS | NORTHWEST ORTHOPAEDIC ASSOCIAT |
| ST ANTHONY HOSPITAL | SURGERY CENTER OF TRI-CITY |
| YAKIMA REGIONAL | WENATCHEE VALLEY MEDICAL CENTE |
| ST JAMES COMMUNITY HOSP | CIPRIANO, DOUGLAS, MD |
| ST JOSEPH REGIONAL MED CTR | ORTHOPAEDICS NORTHWEST PLLC |
| ST MARY HOSPITAL | UTAH SURGICAL CENTER |
| ST PATRICK HOSPITAL | ORTHOPAEDIC SURGERY AND SPORTS |
| ST PETERS HOSPITAL | YELLOWSTONE SURGERY CENTER |
| ST VINCENT HOSPITAL | NORTHEAST WASHINGTON MED GROUP |
| SACRED HEART MEDICAL CTR | FAGGARD, JOHN, MD |
| SAMARITAN HOSPITAL | EAST OREGON SURGERY CENTER |
| SAINT LUKE COMMUNITY HOSP | KOPPLIN, MATTHEW A., MD |
| SHRINERS HOSPITAL FOR CHILDREN | LEWIS & CLARK ORTHOPAEDIC INST |

PALOUSE SURGERY CENTER LLC
FLATHEAD VALLEY ORTHOPEDIC CEN
HEALTHCENTER NORTHWEST
CENTRAL WA ORTHOPAEDIC SURGEON
GREENDYKE, SPENCER D., MD, LLC
PEACOCK, DEREK, MD
RIVEREDGE ORTHOPEDICS
YORGASON, MICHAEL R., MD
RAVALLI ORTHOPEDICS AND SPORT
TRI CITY ORTHOPAEDIC CLINIC
CHAU, WING, MD

STARKWEATHER ORTHOPEDIC &
ORTHOPAEDIC ASSOCIATES
CHEWELAH ASSOCIATES PHYSICIAN
PAIN MANAGEMENT OF NORTH IDAHO
NORTHWEST AMBULATORY PHYSICIAN
INLAND NEUROSURGERY & SPINE
GABERT MEDICAL SERVICES
CHAMPIONS SPORT MEDICINE
LIFESPAN FAMILY MEDICINE SPECI
GREGGAIN, DONALD, MD &
HIGH DESERT SURGERY CENTER
ASSOCIATES IN ORTHOPAEDIC SURG

This injunction shall remain in effect until the conclusion of arbitration between the parties as required by the terms of the Sales Representative Agreement, (Hr'g Ex. 1 ¶ 18), and the Sales/Service Representative Agreements. (Hr'g Ex. 12 ¶ 18; Hr'g Ex. 13 ¶ 18; Hr'g Ex. 14 ¶ 18.)

**IT IS SO ORDERED,** this 18th day of December, 2012.

/s/ Jon P. McCalla
JON PHIPPS McCALLA
CHIEF U.S. DISTRICT JUDGE